## W. B. WOOD MFG. CO. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1923.)

No. 3105.

**1 Food ☞12—Arsenic, as ingredient of coloring material, held "added" to the product within the statute; "added poisonous ingredient."**

Where, in the manufacture of coloring material, the manufacturer added sulphanilic acid to a coal tar derivative, the arsenic in such acid was "added," within Food and Drug Act, § 7, subd. 5 (Comp. St. § 8723), declaring food adulterated if it contains any added poisonous or other deleterious ingredient rendering it injurious to health.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Added Poisonous Ingredient.]

**2. Food ☞12—Arsenic in small quantity held not to render coloring material "injurious to health."**

Where it was impossible to eliminate arsenic entirely from coloring material, the presence of such a small quantity that, when diluted as ordinarily used, it would take years to produce a dose of one-thirtieth of a grain, such as is ordinarily prescribed by physicians, *held* not to render the coloring material "injurious to health," within Food and Drug Act, § 7 (Comp. St. § 8723), relative to adulteration.

[Ed. Note.—For other definitions, see Words and Phrases, Injurious.]

**3. Food ☞12—Presence in coloring material of greater percentage of salt than percentage fixed by Secretary of Agriculture does not render it adulterated.**

Where the quantity of salt used in coloring material varied with each manufacturer, and even somewhat in the product of a single manufacturer, and it had the effect of increasing the quantity of coloring material, and, regardless of the percentage used, required great dilution by the user, the Secretary of Agriculture had no authority, under Food & Drug Act, § 7 (Comp. St. § 8723), to establish an arbitrary percentage beyond which manufacturers could not go without violating that section, and in the absence of any deceptive labeling a coloring material containing a larger percentage of salt did not violate that section.

**4. Food ☞15—"Misbranded" when label of coloring material containing more salt than prescribed by department states it complies with all requirements.**

Where, under the decisions of the Department of Agriculture, coloring material containing more than 5 per cent. of salt could not be certified, and a coloring material containing a greater percentage carried a label bearing the words, "Warranted. Complies with all requirements"—it was "misbranded," within Food & Drug Act, § 8 (Comp. St. § 8724), as the label would tend to convey the belief that the color was warranted to comply with the decisions of the department.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Misbrand—Misbranding.]

In Error to the District Court of the United States for the Eastern District of Illinois.

Suit by the United States to forfeit certain coloring material claimed by the W. B. Wood Manufacturing Company. Judgment for the United States, and the claimant brings error. Affirmed.

June C. Smith, of Centralia, Ill., and Taylor R. Young, of St. Louis, Mo., for plaintiff in error.

Fred D. Silloway, of Washington, D. C., amicus curiæ.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before BAKER, ALSCHULER, and EVAN A. EVANS, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Judgment was rendered in the District Court in favor of defendant in error, libelant, confiscating certain coloring material, a product of coal tar oil, after plaintiff in error had intervened and a trial on the merits had occurred. The issues were very much narrowed by the answer, which admitted the manufacture and shipment of the objectionable material. Plaintiff in error denied that the coloring material was adulterated, denied adding poisonous or other deleterious ingredients injurious to health, and denied any misbranding of the commodity. The controverted issues were resolved in favor of the government by the trial judge, who found:

"First. That the can of coal tar color libeled in this case passed in interstate commerce and remained within the jurisdiction of this court unsold and in the original and unbroken package.

"Second. That sodium chloride and sodium sulphate had been mixed and packed with the coloring matter in said can, so as to lower and reduce and injuriously affect its quality and strength.

"Third. That sodium chloride and sodium sulphate had been substituted wholly or in part for quality color which the label on the can purported the article to be.

"Fourth. That the can of coal tar color libeled contained an added poisonous or deleterious ingredient, to wit, arsenic, which may render said article injurious to health.

"Fifth. That the statement borne on the label of the can, to wit, 'Warranted comply with all requirements, quality color,' is false and misleading, and labeled so as to deceive and mislead the purchaser."

The coloring is manufactured for bakers, ice cream manufacturers, and soft drink producers, and the government chemist found it to consist of—

Sodium chloride.....................................39.14%
Sodium sulphate..................................... 3,61%
Tartrazine .........................................30.00%
Orange II..........................................16.00%
Arsenic ...........................................20 parts per million.
Balance—moisture and heavy metals.

There are two kinds of color used in food—cochineal, which is rarely used and not here involved, and analine color, which is the result of chemical combination produced by the mixture of two coal tar derivatives. In its preparation it is necessary to use sulphanilic acid, which contains more or less arsenic trioxide.

The judgment is predicated on (a) the presence of arsenic, (b) too much salt, and (c) false labeling.

Concerning the presence of the arsenic in the product, plaintiff in error contends that, unless the manufacturer adds the ingredient, arsenic, he is not liable under Food and Drug Act, § 7, subd. 5 (Comp. St. § 8723), which provides the test:

"If it contain any added poisonous or other added deleterious ingredient which may render such article injurious to health."

Because of the word "added," it is urged that the finding should be in favor of plaintiff in error, for at no time was arsenic added to the

coloring. It is further contended that the analysis fails to show arsenic in sufficient amount to render such article injurious to health.

[1] It is established by the evidence that the arsenic in the coloring matter is traced to the sulphanilic acid, which was added to the coal tar derivative, and without this acid there would be no arsenic, or at least none in objectionable quantities. We therefore reject this first contention, for in the manufacture of this food product the manufacturer introduced the sulphanilic acid. In other words, the acid containing the arsenic was *added* to the coal tar product, and therefore arsenic was "added."

[2] We are not satisfied, however, that arsenic in such quantity as to be injurious to health was present. The government recognizes the impossibility of eliminating arsenic entirely. In fact, the testimony shows that the elimination of arsenic would be at most but a matter of degree. The government certifies color when arsenic is present, and when only sightly less than that found in the confiscated product.

The evidence in the case does not present a disputed issue of fact, but rather a difference between chemists over the meaning of the words "deleterious ingredient, injurious to health." In recognizing that a small quantity of arsenic is not injurious to health, the government acknowledges that this term is a relative one. Arsenic is found in infinitesimal quantities in so many articles of food that it has been said that the air we breathe, the water we drink, the smoke and dust we inhale, and all the foods we consume contain arsenic. If the term be an absolute one, then they would all be condemned. The quantity of arsenic found in this coloring material is so infinitesimal that, when diluted as it is ordinarily used, it would take years to produce "a dose" such as is ordinarily prescribed by physicians—one-thirtieth of a grain. In other words, one would be required to drink 150,000 bottles of soda before he would have consumed a quantity of arsenic sufficient to equal the "dose."

It may be true that by further process the amount of this drug can be reduced, but complete elimination is impossible. The Congress has not assumed to define with absolute particularity what is or what is not injurious, and we cannot accept the testimony of the one witness who testified for the government to the effect that the word "injurious" is an absolute term. Rather do we conclude upon the testimony before us that the arsenic present in the quantity disclosed was not injurious to health.

[3] After mixing the two coal tar derivatives, to which is added the sulphanilic acid, the manufacturer is confronted with the problem of eliminating the water. This is done either by freezing or by salting, or by both freezing and salting. As the color is invariably reduced when used, the manufacturer has found the salting method desirable, because "up to a certain limit" the addition of salt produces a greater quantity of coloring material. It may be true that, the more salt there is added, the less the user will dilute, but otherwise no injury to the product, as such, is occasioned by the presence of salt up to 40 or 50 per cent. of the gross quantity. The seller gives directions to the purchaser for the dilutions, which vary according to the percentage of salt. To reduce the salt

content is expensive, but when it is reduced to a point below 5 per cent. it is (other ingredients being satisfactory) properly subject for certification by the government.  F. I. D. No. 77.

The government contends that shipping this coloring material containing 40 or 50 per cent. of salt in interstate commerce is a violation of section 7, which reads:

"That for the purposes of this act an article shall be deemed to be adulterated:

⁂    ⁂    *    *    *    *    *    ⁂    *    ⁂

"In the case of food:

"First. If any substance has been mixed and packed with it so as to reduce or lower or injuriously affect its quality or strength.

"Second. If any substance has been substituted wholly or in part for the article.

⁂    *    *    *    ⁂    *    *    ⁂    ⁂    ⁂

"Fifth. If it contained any added poisonous or other added deleterious ingredient which may render such article injurious to health."

With this contention we cannot agree, unless, as here, the product is sold under a false label.  In other words, we cannot accept the contention of counsel for the government that the coloring material, weakened (but not injured) by the larger percentage of salt, violates section 7 of the act, so long as it is not labeled or sold as a certified color.  In this respect, perhaps, the designation "quality color" is also objectionable and deceptive.  In other words, we have presented a case where a food product (coloring material) is made and its lawful sale authorized, which contains an ingredient (salt) which is harmless in itself. The quantity of the ingredient used varies with each manufacturer, and the product of each single producer also varies somewhat.  Aside from its influence upon the cost of production, the presence of salt has the effect of increasing the quantity of coloring material *and regardless of the percentage used* (up to 50 per cent. at least), *it must be very greatly diluted by the user.*

Upon these facts we have no hesitancy in saying that the statute does not, nor was it intended to, give the Secretary of Agriculture any authority to fix or establish an arbitrary per cent. (say 5 per cent.), beyond which the manufacturer cannot go without violating this section.

[4] While holding that the salt content here shown does not violate section 7 of the act, no support or justification can be found therefrom for the attempt of plaintiff in error to sell its product as a certified coloring material with a salt content less than 5 per cent.  The goods as shipped carried a label upon which appeared the following words:

"Warranted. Complies with all requirements. Quality color. No. 810. Contents yellow."

Section 8 of the Food and Drug Act (Comp. St. § 8724) reads:

"That the term 'misbranded,' as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article * * * which shall be false or misleading in any particular. * ⁂ ⁂

"That for the purposes of this act an article shall also be deemed to be misbranded: ⁂ ⁂ ⁂

"In the case of food: * * *

"Second. If it be labeled or branded so as to deceive or mislead the purchaser.  *  *  *

"Fourth. If the package containing it or its label shall bear any statement, design, or device regarding the ingredients or the substances contained therein, which statement, design, or device shall be false or misleading in any particular.  *  *  *"

There are certain regulations or requirements of the Department of Agriculture dealing with the use of food coloring, and the government contends, and we think justly, that the language quoted, "Warranted. Complies with all requirements"—was intended, and would reasonably tend, to convey the belief that the color was warranted to comply with the Food Inspection Decisions of the Department of Agriculture. Our attention has not been called to any other explanation that would give effect to the word "requirements." Inasmuch as the color under consideration did not comply with the requirements of the Department of Agriculture for certification, there was a misstatement, a misbranding of the package, which subjected the article to confiscation.

The judgment is affirmed.