DENVER UNION STOCK YARD CO. *v.* PRO-
DUCERS LIVESTOCK MARKETING
ASSOCIATION.

No. 106.   Argued March 10, 1958.—Decided April 28, 1958.*

*Together with No. 118, *Benson, Secretary of Agriculture,* v. *Pro-ducers Livestock Marketing Association,* also on certiorari to the same Court.

*Ashley Sellers* argued the cause for petitioner in No. 106. With him on the brief were *Winston S. Howard, Albert L. Reeves, Jr., John D. Conner* and *Jesse E. Baskette.*

*Neil Brooks* argued the cause for petitioner in No. 118. With him on the brief were *Robert L. Farrington* and *Donald A. Campbell.*

*Hadlond P. Thomas* argued the cause and filed a brief for respondent.

*Frederic P. Lee* filed a brief for the American Stock Yards Association, as *amicus curiae,* urging reversal in No. 118.

Briefs of *amici curiae* urging affirmance were filed in No. 118 by *George E. Merker, Jr.* for the National Live Stock Producers Association, *William G. Davisson* for the Oklahoma Livestock Marketing Association et al., and *Allen Lauterbach* for the American Farm Bureau Federation.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This litigation started with a complaint filed by respondent, a market agency at the Denver Union stockyard, with the Secretary of Agriculture, alleging that certain Regulations issued by Denver Union Stock Yard Company are invalid under the Packers and Stockyards Act, 42 Stat. 159, as amended, 7 U. S. C. § 181 *et seq.* The Regulations complained of provide:

> "No market agency or dealer engaging in business at this Stockyard shall, upon Stock Yard Com-

pany property, or elsewhere, nor shall any other person upon Stock Yard Company property—

"(1) Solicit any business for other markets, for sale at outside feed yards or at country points, or endeavor to secure customers to sell or purchase livestock elsewhere; or

"(2) In any manner divert or attempt to divert livestock from this market which would otherwise normally come to this Stock Yard; or

"(3) Engage in any practice or device which would impair or interfere with the normal flow of livestock to the public market at this Stockyard." [1]

The complaint was entertained; and the Stock Yard Company admitted that it issued the Regulations and alleged that they were necessary to enable it "to furnish, upon reasonable request, without discrimination, reasonable stockyard services . . . and to enable the patrons of the Denver Union Stockyards to secure, upon reasonable request, without discrimination, reasonable stockyard services . . . ." The prayer in the answer was that the

---

[1] The Regulation goes on to state the applicability of the foregoing provisions.

"The normal marketing area from which livestock would normally come to the public market at this Stockyard, and which is the area to which this subdivision (c) shall apply, is defined as all of the state of Colorado except that part listed as follows:

"The area lying east of the line beginning with the westerly boundary of the County of Sedgwick where it intersects the Nebraska state line; thence south along the county line of Sedgwick and Phillips counties; thence west and south along the western boundary of Yuma county to its intersection with U. S. Highway 36; thence west to Cope and south along Colorado Highway 59 to Eads, Colorado; thence westerly along Highway 96 to Ordway; thence south on Highway 71 to Timpas; thence southwesterly via Highway 350 to Trinidad; thence south to New Mexico state line.

"The provisions of paragraph (c) do not apply on livestock solely used for breeding purposes."

Stock Yard Company be granted an oral hearing and that the complaint be dismissed. Thereafter the Stock Yard Company filed a motion to require respondent to produce for examination certain books and records. Respondent opposed the motion, electing to stand upon the illegality of the Regulations as a matter of law. The Examiner certified the question to the Judicial Officer for decision, recommending that the proceeding be dismissed. The Judicial Officer [2] dismissed the complaint, holding that he could not find the Regulations invalid on their face. 15 Agr. Dec. 638. The Court of Appeals reversed,[3] holding that the Regulations are an unlawful restriction on the statutory rights and duties of stockyards and market agencies under the Act. 241 F. 2d 192. It remanded the case to the Secretary of Agriculture with directions to issue a cease and desist order against the issuance or enforcement of the Regulations. The case is here by certiorari which we granted in view of the public importance of the issue raised. 353 U. S. 982.

The Act defines "market agency" as "any person engaged in the business of (1) buying or selling in commerce live stock at a stockyard on a commission basis or (2) furnishing stockyard services." § 301 (c). The Act also provides that "no person shall carry on the business of a market agency . . . at such stockyard unless he has registered with the Secretary . . . ." § 303. Respondent is registered not only with the Denver Union Stock Yard Co. but with other stockyards as well. One impact of the Regulations on respondent is therefore clear: having registered with this Stock Yard Company it may

---

[2] The authority of the Judicial Officer was delegated by the Secretary of Agriculture (10 Fed. Reg. 13769; 11 Fed. Reg. 177A–233; 18 Fed. Reg. 3219, 3648; 19 Fed. Reg. 11) pursuant to the Act of April 4, 1940, 54 Stat. 81, 5 U. S. C. § 516a *et seq.*

[3] The Court of Appeals had jurisdiction to review the case under 64 Stat. 1129, 5 U. S. C. § 1032.

not, in the "normal marketing area" of the Denver yard (which is defined in the Regulations to embrace a vast area in Colorado [4]), solicit business for, or divert it to, other markets. The market agency registered with the Denver Stock Yard Co. must, while working in the "normal marketing area" of that yard, solicit or do business exclusively for it and for none of the other stockyards with which it is registered.

Yet § 304 of the Act makes it "the duty" of every market agency "to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard." Section 301 (b) defines stockyard services to mean "services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce, of live stock." And § 307 prohibits and declares unlawful "every unjust, unreasonable, or discriminatory regulation or practice."

The words "at such stockyard" as used in § 304 obviously mean, as applied to a "market agency," every stockyard where that "market agency" is registered. From the Act it seems plain, therefore, that the duty of respondent would be to furnish a producer in the Denver area stockyard service at Kansas City, if the producer so desired. Stockyards and market agencies are made public utilities by the Act. *Stafford* v. *Wallace,* 258 U. S. 495, 516; *Swift & Co.* v. *United States,* 316 U. S. 216, 232. Their duty is to serve all, impartially and without discrimination. The Regulations bar both the market agency and the stockyard from performing their statutory duty. A market agency registered with Denver could not by force of the challenged Regulations furnish producers in the

---

[4] For the definition of the "normal marketing area" see note 1, *supra.*

Denver area stockyard services at Kansas City or at any other stockyard where the agency is also registered. The conflict seems clear and obvious; and no evidence could make it clearer.[5] The case is as simple to us as that of a utility that refuses to sell any power to a customer if the customer buys any power from a competitor; as clear as an attempt by a carrier by rail to deny service to one who ships by truck. Cf. *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1; *International Salt Co.* v. *United States,* 332 U. S. 392.

When an Act condemns a practice that is "unfair" or "unreasonable," evidence is normally necessary to determine whether a practice, rule, or regulation transcends the bounds. See *Associated Press* v. *Labor Board,* 301 U. S. 103; *Chicago Board of Trade* v. *United States,* 246 U. S. 231; *Sugar Institute* v. *United States,* 297 U. S. 553. But where an Act defines a duty in explicit terms, a hearing on the question of statutory construction is often all that is needed. See *Securities and Exchange Comm'n* v. *Ralston Purina Co.,* 346 U. S. 119 (public offering); *Addison* v. *Holly Hill Co.,* 322 U. S. 607 (area of production). It is, of course, true that § 310 of the Act provides for a "full hearing" on a complaint against a "regulation" of a stockyard. That was also true of the Act involved in *United States* v. *Storer Broadcasting Co.,* 351 U. S. 192. But we observed in that case that we never presume that Congress intended an agency "to waste time on applications that do not state a valid basis for a hearing." *Id.,* at 205.

The critical statutory words in the present case are from § 304 providing, "It shall be the duty of every stockyard owner and market agency to furnish upon reasonable request, without discrimination, reasonable stockyard

---

[5] Whether the Regulations as applied to "dealers" are valid is a question we do not reach.

services at such stockyard." The Secretary's emphasis in the argument was on the words "reasonable stockyard services." By analogy to the antitrust cases, a case is built for fact findings essential to a determination of what is "reasonable." See *Standard Oil Co.* v. *United States,* 221 U. S. 1; *Chicago Board of Trade* v. *United States, supra.* Certainly an evidentiary hearing would be necessary if, for example, a method of handling livestock at a particular stockyard was challenged as unreasonable. See *Morgan* v. *United States,* 298 U. S. 468; *Morgan* v. *United States,* 304 U. S. 1; *United States* v. *Morgan,* 307 U. S. 183. But that argument is misapplied here. It misconceives the thrust of the present Regulations, which are aimed at keeping market agencies registered at Denver from doing business for producers, who are in the "normal marketing area" of the Denver yard, at any other market. These Regulations bar them from rendering, not some stockyard services at the other yards, but any and all other stockyard services for those producers, except at Denver. "No" stockyard services cannot possibly be equated with "reasonable" stockyard services under this Act.

The argument *contra* is premised on the theory that stockyard owners, like feudal barons of old, can divide up the country, set the bounds of their domain, establish "no trespassing" signs, and make market agencies registering with them their exclusive agents. The institution of the exclusive agency is, of course, well known in the law; and the legal problem here would be quite different if the Act envisaged stockyards as strictly private enterprise. But, as noted, Congress planned differently. The Senate Report proclaimed that these "great public markets" are "public utilities." S. Rep. No. 39, 67th Cong., 1st Sess. 7. The House Report, in the same vein, placed this regulation of the stockyards on a par with the regulation of the railroads. H. R. Rep. No. 77, 67th Cong., 1st Sess. 10.

It was against this background that Chief Justice Taft wrote in *Stafford* v. *Wallace, supra,* at 514:

> "The object to be secured by the act is the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence in the form of meat products to the consuming cities of the country in the Middle West and East, or, still as live stock, to the feeding places and fattening farms in the Middle West or East for further preparation for the market."

He went on to say that the Act treats the stockyards "as great national public utilities," *id.,* at 516. His opinion echoes and re-echoes with the fear of monopoly in this field.

We are told, however, that the economics of the business has changed, that while at the passage of the Act most livestock purchases were at these stockyards, now a substantial portion—about 40 percent, it is said—takes place at private livestock markets such as feed yards and country points. From this it is argued that the present Regulation is needed to keep the business in the public markets, where there is regulation and competition, and out of the private markets where there is no competitive bidding and regulation. If the Act does not fit the present economics of the business, a problem is presented for the Congress. Though our preference were for monopoly and against competition, we should "guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194.

We take the Act as written. As written, it is aimed at all monopoly practices, of which discrimination is one. When Chief Justice Taft wrote of the aim of the Act in

terms of the ends of a monopoly, he wrote faithfully to the legislative history. The Senate Report, *supra,* at 7, stated "It has been demonstrated beyond question that the history of the development of this industry has been the history of one effort after another to set up monopoly." The present Regulations, it seems, have had a long ancestry.

*Affirmed.*

MR. JUSTICE CLARK, concurring.

I agree that invalidity is evident on the face of the regulations issued by the Denver Union Stock Yard Company. Section 304 of the Packers and Stockyards Act, 42 Stat. 164, as amended, 7 U. S. C. § 205, requires a market agency registered at a given stockyard to furnish reasonable services at that stockyard on reasonable request of a customer. Respondent's complaint alleges that respondent is registered at other stockyards besides the Denver yard, and because of petitioner's motion to dismiss the complaint we take those allegations as true. Under § 304, the several registrations impose a duty on the part of respondent to offer Colorado customers reasonable service at each yard where it is registered. Since the Denver regulations prohibit respondent's fulfillment of that statutory duty, they would appear void on their face under § 307, which declares unlawful "every unjust, unreasonable, or discriminatory regulation or practice." 42 Stat. 165, as amended, 7 U. S. C. § 208.

The regulatory scheme devised by the Congress, however, makes it possible for invalidity on the face of the regulations to be overcome by evidence showing that their application and operation is not in fact unjust, unreasonable, or discriminatory. Primary jurisdiction is placed in the Secretary to make such a determination. Because of that, I should think the normal course of action where dismissal is found unwarranted would be to remand the case to the Secretary for a full hearing.

That procedure does not appear to be in order here, however, because the purpose and intended effect of the regulations is crystal clear. The president of the Denver stockyard, before the case took its present posture, filed an affidavit in the record alleging in substance that in the period July 1, 1951, to June 30, 1955, respondent market agency "continually diverted away from the Denver Union Stockyards a large volume of livestock" which normally would have been consigned to that yard, that respondent sold lambs "direct to many packers . . . including some located on the Atlantic Coast and in interior Iowa," and that "many like transactions were conducted by [respondent] in its own name or for its account by its wholly owned subsidiary, the Western Order Buyers, or by the employees of [respondent] or its said subsidiary." The affidavit further recites that, "As a result, the Denver Union Stock Yard Company in the early part of this year [1955] issued item 10 (c) of its rules and regulations which was designed to . . . eliminate an unjust, unreasonable, and discriminatory practice by [respondent] . . . ." The purpose and effect of the regulations is made certain by the additional statement that, "[I]t was felt that market agencies may not engage in transactions away from the Denver market inconsistent with the duties imposed upon them to render the best possible service *which, when boiled down, means that they must refrain from diverting the normal flow of livestock to this market if they are to continue to operate at the market.*" (Emphasis added.) With greater force than any other possible evidence, this frank statement reveals that petitioner intended to, and did, monopolize the livestock market in the entire State of Colorado, save a small area on the eastern border. Since the Denver stockyard itself would impose the only sanction possible for violation of the regulation, namely, cancellation of registration, the affidavit is a complete answer to any

evidence offered as to reasonableness in practical operation. The regulations, according to their author, bluntly say that to continue operation on the Denver market a registrant "must refrain" from selling Colorado livestock, unless from the small area mentioned above, on any other market. It would be a useless formality to remand in the light of such an irrefutable acknowledgment.

It also is worthy of note that petitioner elected to defend the regulations without any evidence when it moved to dismiss the complaint before the Secretary. Petitioner could have offered its presently proffered explanations then but chose not to do so. While such action does not preclude a remand now for a full hearing, petitioner's about-face on losing the battle lends no support to its cause.

For these reasons I join the judgment of affirmance.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins, dissenting.

The sole question presented by the case is this:

Under his powers and duties to effectuate the scheme designed by Congress through the Packers and Stockyards Act of 1921, for the regulation of the stockyards industry, is the Secretary of Agriculture barred from determining on the basis of evidence whether or not regulations are reasonable that are promulgated by the Denver Stockyards for the purpose of preventing the diversion of stockyard services from the Denver Stockyards that as a matter of normal business flow would go to the Denver yards, on the challenge to such regulations by a market agency registered at the Denver Stockyards to furnish "reasonable stockyard services" at that yard?

To deny the Secretary of Agriculture the power even to hear evidence as to the reasonableness of such regulations is to misconceive the whole scheme for the regional

regulation of the stockyards industry for which stockyards and market agencies are geographically licensed, and to deny to the Secretary of Agriculture powers of administration that Congress has conferred upon him.

While a regulation may, like the one in question, on its face—that is, abstractly considered—appear to be unreasonable because discriminatory, elucidation of such a regulation in the concrete, on the basis of its practical operation in light of evidence, may negative such appearance. It is for the Secretary of Agriculture to hear such relevant evidence and to assess it, subject to the appropriate scope of judicial review. This proceeding should therefore be remanded to the Secretary of Agriculture for appropriate action. These views are elaborated in MR. JUSTICE WHITTAKER's opinion, which I join.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE FRANKFURTER and MR. JUSTICE HARLAN join, dissenting.

I respectfully dissent. The question presented is whether certain regulations issued by the owner of a posted stockyard are void on their face. Petitioner, the Denver Union Stock Yard Company, is the "stockyard owner" [1] of the Denver Union stockyard, a facility in Denver, Colorado, which constitutes a "stockyard" within the meaning of § 302 of the Packers and Stockyards Act,[2]

---

[1] By § 301 (a) of the Packers and Stockyards Act (42 Stat. 159, as amended, 7 U. S. C. § 181 *et seq.*) the term "stockyard owner" is defined to mean "any person engaged in the business of conducting or operating a stockyard."

[2] Section 302 of the Act defines a stockyard to be "any place, establishment, or facility commonly known as stockyards, conducted or operated for compensation or profit as a public market, consisting of pens, or other inclosures, and their appurtenances, in which live cattle, sheep, swine, horses, mules, or goats are received, held, or kept for sale or shipment in commerce."

42 Stat. 159, as amended, 7 U. S. C. § 181 *et seq.*—hereinafter called the Act. In 1921 the Secretary of Agriculture, pursuant to § 302 (b) of the Act, "posted" that stockyard, and it thereupon became, and has since been, subject to the provisions of the Act. Under § 304, it became the "duty" of petitioner "to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard"; [3] and, under § 307, it also became its "duty" to "establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services" at that stockyard. Pursuant thereto petitioner filed with the Secretary on May 11, 1955, an amendment of its existing regulations to become effective May 25, 1955. The amended regulations, in pertinent part, provide:

> "No *market agency* or *dealer* [4] engaging *in business at this Stockyard* shall, upon Stock Yard Company property, or elsewhere, nor shall any other person upon Stock Yard Company property—
>
> "(1) *Solicit* any business for other markets, for sale at outside feed yards or at country points, or *endeavor to secure* customers to sell or purchase livestock elsewhere; or

---

[3] Section 301 (b) defines the term "stockyard services" to mean "services or facilities furnished at a stockyard in connection with the receiving, buying or selling on a commission basis or otherwise, marketing, feeding, watering, holding, delivery, shipment, weighing, or handling, in commerce, of live stock."

[4] Section 301 (d) of the Act defines the term "dealer" to mean "any person, *not a market agency,* engaged in the business of buying or selling in commerce live stock at a stockyard, either on his own account or as the employee or agent of the vendor or purchaser." (Emphasis supplied.)

"(2) In any manner divert *or attempt to divert* livestock from this market which would otherwise normally come to this Stock Yard; or

"(3) *Engage in any practice or device* which would impair or interfere with the normal flow of livestock to the public market at this Stockyard." [5] (Emphasis supplied.)

Sometime after the Denver Union stockyard was "posted," respondent, pursuant to the provisions of § 303, "registered" with the Secretary as a market agency—not as a "dealer"—on the Denver Union stockyard, and thereby acquired the status of a "market agency" under the Act "at such stockyard." Section 301 (c) defines the term "market agency" to mean: "[A]ny person engaged in the business of (1) buying or selling in commerce livestock *at a stockyard on a commission basis,* or (2) furnishing stockyard services." (Emphasis supplied.) By § 306 (a), it became the duty of respondent, as a "market agency at such stockyard," to print, file with the Secretary, and keep open to public inspection "at the [Denver] stockyard," a schedule showing all rates and charges for "stockyard services" to be furnished by it "at such stockyard"; and, under § 304, it became its duty "to furnish upon reasonable request, without discrimination, reason-

---

[5] The regulations also stated that the "area from which livestock would normally come to the public market at this Stockyard" is the State of Colorado, except approximately the eastern one-sixth of it.

The amended regulations are similar to preceding ones, effective June 1, 1938, which, among other things, said: "No person, without the express permission of this Company in writing, shall solicit any business in these yards for other markets, sales at outside feed yards or country points, or endeavor to secure customers to sell or purchase livestock elsewhere." Regulations of the Denver Union Stockyards Company (effective June 1, 1938), p. 4, § 11, Rules 10 and 11, on file in the Livestock Division, Agricultural Marketing Service, United States Department of Agriculture, Washington, D. C.

able stockyard services *at such stockyard."* [6]  (Emphasis supplied.)

Section 309 (a) provides, *inter alia,* that: "Any person complaining of anything done . . . by any stockyard owner . . . in violation of the provisions [of the Act] may . . . apply to the Secretary by petition which shall briefly state the facts, whereupon the complaint . . . shall be forwarded by the Secretary to the defendant, who shall be called upon . . . *to answer it in writing,* within a reasonable time to be specified by the Secretary." (Emphasis supplied.)  The following section (§ 310), in relevant part, provides: "Whenever after *full hearing* upon a complaint . . . *the Secretary is of the opinion* that any . . . regulation . . . of a stockyard owner . . . for or in connection with the furnishing of stockyard services, is or will be unjust, unreasonable, or discriminatory, *the Secretary—*

"(a)  May determine and prescribe . . . what regulation . . . is or will be just, reasonable, and nondiscriminatory to be thereafter followed; and

"(b)  May make an order that such owner or operator . . . (3) shall conform to and observe the regulation . . . so prescribed."  (Emphasis supplied.)

---

[6] Section 312 of the Act is also relevant.  It provides: "(a) It shall be unlawful for any *stockyard owner, market agency,* or *dealer* to engage in or use any *unfair, unjustly discriminatory, or deceptive practice or device* in connection with the receiving, marketing, buying or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing or handling, in commerce at a stockyard, of live stock.

"(b) Whenever complaint is made to the Secretary by any person, or whenever the Secretary has reason to believe, that any stockyard owner, market agency, or dealer is violating the provisions of subdivision (a) *the Secretary* after notice *and full hearing* may make an order that he shall cease and desist from continuing such violation to the extent that *the Secretary finds* that it does or will exist." (Emphasis supplied.)

Invoking the Secretary's regulatory powers under § 310 (a), respondent, on July 7, 1955, filed a complaint with the Secretary, alleging that the quoted regulations were unauthorized because the Act authorized the stockyard owner "to establish 'regulations and practices [only] in respect to the furnishing of stockyard services'; and that [the] practice purported to be prescribed or established by [the regulation] does not . . . relate to the furnishing of stockyard services and is therefore unauthorized and invalid"; and, without waiving that contention, it further alleged that the regulation "is unjust, unreasonable and discriminatory, and should be set aside as unlawful"; it then proceeded to state its conclusions respecting the operation and effect of the regulations, and ultimately prayed that they "be set aside and annulled."

Thereupon the Secretary sent a copy of the complaint to petitioner, and, in a covering letter, stated that the complaint would be entertained as a "disciplinary proceeding" in accordance with § 202.6 (b) of his rules of practice; advised that petitioner was required to file an answer within 20 days from receipt of the complaint "containing a definite statement of the facts which constitute the grounds of defense"; and concluded that, under his rules of practice, "the burden of proof [would] be upon the complainant to establish the matters complained of." Petitioner answered, admitting that it was the "owner" of the "posted" Denver Union "stockyards"; that respondent was "registered" to do business thereon as a "market agency"; that it had published the questioned regulations, but specifically denied the conclusions concerning the interpretation and effect of the regulations, and generally denied all other averments of the complaint, and then proceeded to allege facts which it concluded made the regulations reasonable and necessary to prevent unfair and unjustly discriminatory practices by

market agencies and dealers, registered as such at that stockyard, in connection with receiving and handling livestock, and to enable it to render, and to require market agencies to render, "reasonable stockyard services" at the Denver Union stockyard.

Soon afterward, petitioner, in preparing for the hearing, filed with the Secretary and served upon respondent a motion to produce for inspection certain of the latter's books and records, alleged to contain evidence relevant and material to the issues. Respondent then filed a "reply" to the motion in which it resisted production of the books and records upon the ground that the regulations were void on their face. Petitioner moved to strike that reply as not responsive to the motion to produce. After argument, the hearing examiner issued an "interim ruling," in which he said, "We cannot hold, as complainant asks, that respondent's regulation violates the law on its face. We must have facts to see whether the regulation, or action taken under it, is reasonable under the circumstances"; but he did not sustain the motion to produce. Instead he set the proceeding for hearing at Denver on January 24, 1956, and indicated that if, after respondent had produced its evidence, it appeared necessary to the presentation of petitioner's defense he would sustain the motion.

On December 23, 1955, respondent filed what it termed an "Election To Rest," reciting "that this complainant elects to stand upon the illegality of said regulation, as a matter of law," and that it would "not present evidence in this cause." Thereupon petitioner moved to dismiss the complaint for failure of respondent "to sustain the burden of making a prima facie case in support of its complaint." After hearing the parties upon that motion, the hearing examiner certified the proceeding to the Judicial

Officer[7] for decision, with a recommendation that it be dismissed. The Judicial Officer, after hearing the parties orally and upon briefs, concluded that the regulations were not void on their face and that, in the total absence of evidence, he could not find that the regulations were invalid, and dismissed the proceeding. 15 Agr. Dec. 638.

Pursuant to 5 U. S. C. § 1034, respondent filed in the Court of Appeals its petition against the United States and the Secretary of Agriculture to review the decision and order of the Judicial Officer.[8] The Denver Union Stock Yard Company intervened as a respondent. The Court of Appeals, concluding that "[t]he compulsion of the regulation is in immediate conflict with the requirement of Sec. 304 which contemplates and imposes the duty upon marketing agencies to render reasonable services to their customers at *every* stockyard where they do business," held that the regulations were void on their face and reversed the decision of the Judicial Officer, and also remanded the proceeding to the Secretary "with instructions to vacate the order dismissing [the] complaint and [to] enter an appropriate order requiring the Denver Union Stockyard Company to cease and desist from issuing or enforcing [the] regulation." 241 F. 2d, at 196–197. Upon petition of the Denver Union Stock Yard Company in No. 106, and of the Secretary of Agriculture in No. 118, we granted certiorari. 353 U. S. 982.

This Court now affirms. Its opinion, like that of the Court of Appeals, is based upon the conclusion that the

---

[7] Authority to review and determine such proceedings had been delegated by the Secretary of Agriculture to the Judicial Officer (10 Fed. Reg. 13769; 11 Fed. Reg. 177A–233; 18 Fed. Reg. 3219, 3648; 19 Fed. Reg. 11) pursuant to the Act of April 4, 1940, 54 Stat. 81, 5 U. S. C. § 516a.

[8] The Court of Appeals had jurisdiction to review the proceeding under 5 U. S. C. § 1032.

regulations conflict with the provisions of § 304 of the Act. The majority have expressed the basis of their conclusion as follows: "The market agency registered with the Denver Stock Yard Co. must, while working in the 'normal marketing area' of that yard, solicit or do business exclusively for it and for none of the other stockyards with which it is registered. Yet § 304 of the Act makes it 'the duty' of every market agency 'to furnish upon reasonable request, without discrimination, reasonable stockyard services *at such stockyard.*' . . . From the Act it seems plain, therefore, that the duty of respondent would be to furnish a producer *in the Denver area* stockyard service *at Kansas City,* if the producer so desired. . . . Their duty is *to serve all,* impartially and without discrimination. The Regulations bar both the market agency and the stockyard from performing their statutory duty. . . . The conflict seems clear and obvious; and no evidence could make it clearer." (Emphasis supplied.)

In my view, the reasoning and conclusion of both the Court of Appeals and this Court misinterpret the provisions of the Act, and the regulations as well.

The first, and most grievous, misinterpretation stems from the failure to appreciate that respondent's status, privileges and obligations, as a registered "market agency" at the Denver Union stockyard, are limited by the Act to "such stockyard," and that the challenged regulations apply only to a "market agency or dealer engaging in business at this Stockyard"—the Denver Union stockyard. As earlier shown, § 303 plainly states that after the Secretary has "posted" a particular stockyard "no person shall carry on the business of a market agency . . . *at such stockyard* unless he has registered with the Secretary [stating, among other things] the kinds of stockyard services . . . which he furnishes *at such stockyard.*" By equally clear language § 306 (a) makes it the duty of "every market agency *at such stockyard* [to print, file

with the Secretary] and keep open to public inspection *at the stockyard,* schedules showing all rates and charges for the stockyard services furnished by such person *at such stockyard."* Section 304 is no less plain in stating that it is the duty of every "market agency to furnish upon reasonable request, without discrimination, reasonable stockyard services *at such stockyard."* (Emphasis supplied.) I submit that these provisions of the Act leave no room to doubt that a person by registering with the Secretary to do business as a market agency at a particular stockyard acquires the rights, and assumes the obligations, of a "market agency" only "at such stockyard." And inasmuch as the challenged regulations apply only to a "market agency or dealer engaging in business at this Stockyard"—the Denver Union stockyard—they cannot have any application or effect at any other stockyard. Registration to do business as a "market agency" at "such stockyard" does not give the registrant the status of a "market agency," or create the right or obligation to furnish "stockyard services," at all stockyards in the Nation, or at any place other than a particular stockyard where so registered as a "market agency." While a market agency is a public utility (*Stafford* v. *Wallace,* 258 U. S. 495; *Swift & Co.* v. *United States,* 316 U. S. 216, 232), it is such only on the posted stockyard where registered as a market agency. Doubtless one who has the status of a "market agency," and thus also of a public utility, at the Denver stockyard, may, by an additional registration under § 303, acquire a like status at another posted stockyard, yet he would not thereby become *one* market agency or *one* public utility covering the several stockyards where so registered. On the contrary, his status as a market agency and public utility on each of such posted stockyards would be just as several, separate and independent as though owned by different persons. In legal effect, a "market agency" and public utility on

one posted stockyard is a separate entity from a "market agency" and public utility on another, even though both be owned by the same person. And regulations promulgated by the "stockyard owner" of one of such stockyards, applicable to a "market agency" thereon, could have no application or effect at another posted stockyard or to a registered "market agency" thereon. Hence the question is not whether the challenged regulations might restrict a "market agency" on some other posted stockyard from furnishing reasonable stockyard services at such other stockyard, for the challenged regulations have no application to a "market agency" on such other stockyard, but apply only to a "market agency or dealer engaging in business at [the Denver Union] Stockyard."

The question then is whether the challenged regulations may be said, from their face as a matter of law, to obstruct a market agency on the Denver Union stockyard from furnishing just, reasonable and nondiscriminatory stockyard services at that stockyard, where, and only where, they apply. I think analysis of them shows that they do not upon their face in any way conflict with § 304 nor obstruct "the duty of [a] market agency to furnish upon reasonable request, without discrimination, reasonable stockyard services *at such stockyard*"—the Denver Union stockyard—as required by that section. It will be observed that they prohibit a "market agency or dealer engaging in business at this Stockyard" from doing six things. The first subsection provides that they shall not (1) *"solicit* any business for other markets," (2) solicit any business "for sale at outside feed yards," (3) solicit any business for sale "at country points," or (4) *"endeavor to secure* customers to sell or purchase livestock elsewhere"; and the second subsection provides that they shall not (5) "[i]n any manner *divert* or *attempt to divert* livestock from this market . . ."; and the third subsection provides that they shall not (6) "[*e*]*ngage in any prac-*

*tice or device* which would impair or interfere with the normal flow of livestock to the public market at this Stockyard." (Emphasis supplied.) Surely the regulations prohibiting a registered "market agency" on the Denver Union stockyard from soliciting business for other markets, and from soliciting business (livestock) for sale "at outside feed yards" or "at country points," and from endeavoring to induce customers not to buy or sell their livestock on the Denver stockyard, do not at all prohibit it from furnishing stockyard services (note 3) "at such stockyard" (§ 304); and, moreover, as shown, such a market agency is not authorized by the Act to furnish stockyard services "at outside feed yards," at "country points," or at any place other than the posted stockyard upon which it is registered as a market agency. § 303. And inasmuch as a "market agency," as distinguished from a "dealer," may not buy and sell livestock for its own account, but only on a "commission basis" for others, it cannot lawfully own any livestock to "divert," but it is in position to "attempt to divert" livestock from the Denver market, and thus to boycott it, by attempting to cause those who are owners of livestock to ship and sell elsewhere. A regulation prohibiting this surely cannot be said to prevent the market agency from furnishing stockyard services at the Denver yard. Lastly, I believe it cannot logically be contended that the regulation prohibiting a market agency on the Denver yard from engaging *"in any practice or device"* which would impair or interfere with the normal flow of livestock to the Denver stockyard could prevent such market agency from furnishing stockyard services at that stockyard.

It is plain and undisputed that the regulations may not—in the total absence of evidence, as here—be held void unless it is clear upon their face that there cannot be any circumstances under which they, or any of them, could be lawful, "just, reasonable, and nondiscriminatory."

§ 307. And only when it affirmatively and clearly so appears upon the face of the regulations may it be said that a proceeding to contest their validity, in which no evidence whatever is offered to sustain the complaint, constitutes the "full hearing" required by § 310. *General American Tank Car Corp.* v. *El Dorado Terminal Co.*, 308 U. S. 422.

Under the terms of the Act and of the regulations, which we have shown, it seems entirely clear that this is not such a case, and I think it must follow that the regulations cannot be said to be void on their face. The foregoing demonstrates the error of the pivotal conclusion of the Court of Appeals that § 304 "contemplates and imposes the duty upon marketing agencies [registered as such at the Denver Union stockyard] to render reasonable services . . . at *every* stockyard where they do business." (Emphasis by the Court of Appeals.) It also demonstrates, I think, the error of the basic conclusion of the opinion of this Court that: "From the Act it seems plain, therefore, that the duty of respondent would be to furnish a producer in the Denver area *stockyard service at Kansas City,* if the producer so desired. . . . *Their duty is to serve all,* impartially and without discrimination." (Emphasis supplied.)

It is indeed obvious that the Secretary, after the "full hearing" contemplated by § 310, might reasonably find from all the facts adduced at such "full hearing" (1) that the conduct of a "market agency" on the Denver stockyard in boycotting that yard by soliciting livestock for sale at other markets, or at outside feed yards, or at country points, or by endeavoring to induce livestock owners not to buy or sell on the Denver yard and to divert their livestock from the Denver market, constitutes an "unfair, unjustly discriminatory, or deceptive practice or device in connection with the receiving, marketing, buying or selling . . . delivery, shipment . . . or

handling, in commerce at a stockyard, of live stock," in violation of § 312 of the Act (note 6), and (2) that these regulations—or at least some of them—are a "just, reasonable, and nondiscriminatory [means] to be thereafter followed" (§ 310) to prevent such illegal practices by a market agency on that yard, and to enable the stockyard owner to furnish, and to require market agencies on that yard to furnish, "reasonable stockyard services," at the Denver stockyard. But, of course, the Secretary could not make findings in a vacuum—in the total absence of evidence as here. We must keep in mind that Congress, by § 307, made it the "duty" of petitioner to "establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services" at its posted stockyard, and that the questioned regulations were promulgated by petitioner pursuant to that duty. And we must not forget that Congress gave to the Secretary—not to the courts—the duty and power to determine what regulations of a stockyard owner are or will be just, reasonable and nondiscriminatory to be followed in the future, and prescribed the method for challenging, and for determining, the validity of such regulations. By § 309 (a) Congress prescribed that "[a]ny person complaining" shall file a complaint with the Secretary "stat[ing] the facts, whereupon the complaint thus made shall be forwarded by the Secretary to the defendant, who shall be called upon . . . to answer it in writing," and, by § 310, Congress prescribed that if "after full hearing upon [the] complaint . . . , *the Secretary is of the opinion* that any . . . regulation . . . of a stockyard owner . . . is or will be unjust, unreasonable, or discriminatory, *the Secretary*— (a) may determine and prescribe . . . what regulation . . . is or will be just, reasonable, and nondiscriminatory to be thereafter followed; and (b) may make an order that such owner or operator . . . (3) shall con-

form to and observe the regulation . . . so prescribed." Only after "full hearing" of the facts and circumstances could the Secretary perform his duty under § 310 of determining "what regulation will be just, reasonable, and nondiscriminatory to be thereafter followed." By the terms of the Act, Congress left these determinations to the experienced and informed judgment of the Secretary and gave to him appropriate discretion to assess all factors relevant to the subject. *Addison* v. *Holly Hill Co.,* 322 U. S. 607, 614. To determine whether the regulations are just, reasonable and nondiscriminatory the Secretary must "consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238. "Courts deal with cases upon the basis of the facts disclosed, never with nonexistent and assumed circumstances," *Associated Press* v. *Labor Board,* 301 U. S. 103, 132. "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the [Secretary's] discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. After such "full hearing" the Secretary might reasonably find, from all the facts and circumstances disclosed, that all of the regulations were just, reasonable and nondiscriminatory, or that only part of them met that test, or that none of them did so; but it is evident that he could reach no conclusion upon those matters in the total absence of any facts.

Respondent's complaint did not allege that the regulations were void on their face.[9] Rather respondent injected that question collaterally and for the first time by its "reply" to petitioner's motion for an order requiring respondent to produce certain of its records for inspection by petitioner as a step in the latter's preparation for the "full hearing" to be held upon the issues of fact and law that had been joined in the proceeding; and when the hearing officer, after considering that motion and reply, found that he could not determine whether the regulations were valid or invalid without fully hearing the facts, respondent filed its "Election To Rest" stating that "this complainant elects to stand upon the illegality of said regulation, as a matter of law" and that it would "not present evidence in this cause." Respondent thus refused to adduce evidence to sustain its burden of proof upon the issues tendered by its complaint, and hence withdrew its challenge of the need for, and the reasonableness of, the regulations. The Judicial Officer did not hold that the regulations were valid or invalid. He held only that the question could not be determined in a vacuum—without a "full hearing" of the facts—and dismissed the proceeding. In so doing, I believe he was entirely justified and that our analysis of the law and the regulations makes this clear.

It is worthy of note that though the questioned regulations apply to "dealers" as well as market agencies on the Denver stockyard, the validity of the regulations in respect to dealers is in no way here questioned. Yet—in the total absence of evidence and assuming certain facts—

---

[9] As shown in the statement, respondent alleged that the regulation did not "relate to the furnishing of stockyard services and is therefore unauthorized and invalid," and, alternatively, that the regulation "is unjust, unreasonable and discriminatory and should be set aside as unlawful."

this Court affirms the action of the Court of Appeals in striking down the regulations in whole on the ground that they are all void upon their face for conflict with § 304 of the Act. I believe it has been demonstrated that there is no such conflict, and that the regulations are not void on their face. In these circumstances, it was for the Secretary, under § 310, to say after "full hearing" of the facts and circumstances whether the regulations—or some part of them—were just, reasonable and nondiscriminatory; and to say "what regulation [would] be just, reasonable, and nondiscriminatory to be thereafter followed." For these reasons I would vacate the judgment of the Court of Appeals and remand the case to that court with instructions to direct the Secretary of Agriculture to himself initiate a proceeding, as he may do under § 309 (c), to determine whether the challenged regulations, or any of them, are just, reasonable and nondiscriminatory, and to determine, under § 310, after "full hearing" just "what regulation or practice is or will be just, reasonable, and nondiscriminatory to be thereafter followed."